No. 14,104.

WEBB v. EMPIRE CHIEF MINING COMPANY.
(78 P. [2d] 974)

Decided March 28, 1938. Rehearing denied May 9, 1938.

Mr. David F. Strickler, Mr. Thomas M. Burgess, for plaintiff in error.

Mr. Douglas A. Roller, Messrs. Stone, Porter & Stewart, for defendant in error.

*In Department.*

Mr. Justice Bakke delivered the opinion of the court.

Action to determine ownership of a mill erected by plaintiff in error on certain mining properties belonging to the defendant in error. The trial court found the issues generally in favor of the defendant in error. The action below was instituted to restrain another defendant, the Monitor Gold Mining Company, from dismantling and removing the mill. The latter sought to justify its action on a claim of ownership in itself through purchase from Webb. The latter filed a petition in intervention denying ownership in the Empire Chief company, defendant in error, and asserting ownership in himself prior to the sale to the Monitor company, by virtue of his having constructed, at his own expense, the mill involved, pursuant

to an oral agreement between himself and one R. E. L. Townsend, president of the Empire Chief company. The trial below, therefore, was a contest between the Empire Chief company and Webb as to who actually owned the mill in question. The Empire Chief company will be mentioned hereinafter as plaintiff, and Robert D. Webb, as the intervener, or Webb.

The plaintiff, a Colorado corporation, with some 1800 stockholders, had for a number of years prior to 1928, been the owner of a large group of mining claims in the Galena Mining District near Lake City, in Hinsdale county. The parties became acquainted through one R. S. Brown, a mining engineer, who was the manager of a mine operated by intervener near Canon City. A short time prior to the leasing of the premises to intervener, a similar lease had been given to Brown, at whose suggestion R. E. L. Townsend and his son Harry, directors of the plaintiff corporation, visited intervener at his home in Minden, Louisiana, and opened negotiations for a lease on part of the plaintiff company's property. Webb sent his agent, N. R. Grigsby, who was an attorney and also secretary of intervener's company in Louisiana, to Colorado to look over the property and discuss the possibility of leasing it. After an examination, he came with Brown to Denver and conferred with the Townsends about a lease to Brown, and also discussed with plaintiff's attorney provisions of a lease, which was finally entered into and ratified by plaintiff corporation on December 1, 1927. Intervener went into possession of the demised premises with Brown as manager, but being desirous of obtaining larger properties, further negotiations were carried on resulting in another formal lease between the plaintiff and intervener on May 1, 1928. This not being entirely satisfactory either, modifications were made by both parties and the final contract and lease was executed August 7, 1928. It is necessary to quote only two paragraphs of the lease and contract for the purpose of this

opinion, namely, ninth and seventeenth, which read as follows:

"Ninth: It is the intention of Lessee to develop said lease to produce one hundred fifty (150) tons of milling ore per day as quickly as practicable, and it is the intention of the Lessor to equip a unit in its mill building for simple concentration for the handling of one hundred fifty (150) tons of crude ore each twenty-four (24) hours for said Lessee, said mill to be so equipped as soon as practicable. (It is also the intention of Lessor to later install an additional unit of the same capacity, when the production of ore justifies such construction.)

"In case Lessee has a production of milling ore, and the Lessor is unable, because of finances or any other cause, to complete equipping the first unit in its mill building to handle said ore, *then the Lessee shall have the option and privilege of equipping said unit in said mill building, at his own expense,* to handle his ore; Lessee to be reimbursed for said expenditure out of the royalty payment to accrue to Lessor, with the understanding, however, *that all improvements placed in said mill to keep it in good repair and running order when being operated by said Lessee shall become the property of the Lessor upon the termination of this lease.*

"The Lessee shall have the right of operating the first unit so placed in said mill either by Lessor or by Lessee, for handling the milling ore produced under this lease.

"The Lessee agrees when the unit in the mill is fully equipped he will operate same, and in case the ore from the property of the Lessee is not sufficient to keep said unit in continuous operation, he will treat ore for the Lessor at actual cost plus a ten per cent *(10%) depreciation* charge. The Lessor agrees that after the completion of the second one hundred fifty (150) ton unit that in case the ore from its property is not of sufficient volume to keep this unit of the mill in operation, that it will treat any excess ore of Lessee at actual cost plus ten per cent (10%) for depreciation charges."

"Seventeenth: Further, that Lessee will deliver to said Lessor quiet and peaceable possession of said demised premises in good order and condition, with all drifts, tunnels and other passages properly drained and cleared of loose rock and rubbish, and said premises ready for immediate continued working, without demand or further notice on the First day of April, A. D. 1938, at noon; or on April 1st, 1943, provided he elects to take the extension above referred to, or will deliver quiet and peaceful possession at any time upon forfeiture of this lease. It is mutually understood that all buildings and *permanent improvements and machinery, erected upon or affixed to any of the property by Lessee, shall become the property of Lessor at the termination of this Lease; except that loose machinery tools and equipment placed upon said premises by the said Lessee,* may be removed therefrom within twenty (20) days after the termination of this lease; provided, however, that no such tools or machinery shall be so removed while the said Lessee may be in any manner indebted to the said Lessor under any obligation incurred under this lease." (Italics are mine.)

The important language, so far as the plaintiff is concerned, is that italicized in the paragraphs just above quoted. Both of these paragraphs were in the original lease to Brown, with which Grigsby was familiar, and which Webb never modified before he signed.

At the time intervener took possession of the demised premises, the plaintiff owned a mill which had been erected and equipped at a cost of approximately $100,000 for the purpose of treating ore under what is known as the simple concentration or specific gravity method, but the company had found that it no longer was profitable to operate under this system, because there was not a sufficient recovery of the mineral contents of the ore.

It appears that during the decade from 1920 to 1930, the so-called flotation process of concentration had proved successful in several mining districts throughout the

state, and Webb concluded that he could make his operations pay if the flotation process of concentration was installed in the mill, and for that purpose he sought and received permission from the plaintiff corporation to remove the machinery in the existing mill so that he might install machinery for the flotation process, and for the purpose of carrying out this intention he negotiated with a mining machinery company in Denver for the installation of the new equipment. These negotiations are evidenced by the following paragraph from the proposal submitted by the mining machinery company:

"Denver, Colo., Sept. 1, 1928.

"Mr. R. D. Webb, Lake City, Colo.

"Minden, La.

"Dear Sir:—

"We submit herewith for your consideration revised list of the principal items of equipment recommended by us for the 150 ton Flotation Mill at your Empire Chief Properties, Lake City, Colorado. This proposal supersedes our proposal of August 13, 1928."

This proposal was accepted by Webb September 26, 1928, and called for an expenditure of $38,143.10 for machinery f. o. b. Denver. It is not disputed that Webb spent over $92,000 in equipping the mill in question, in anticipation of "a boom," as he testified.

The installation of this machinery was started in the fall of 1928 and the new mill completed in the spring of 1929. Intervener operated it for a year, or until January, 1930, ceasing operations because of disappointing results.

On July 21, 1930, the plaintiff began to put the mill in operating condition, and on August 6, 1930, started running ore, which was in the bins, under the Webb lease, and continued for about two weeks; then operated on company ore until about September 1, 1930, when it ceased further operations, also because the ore was not proving out. A watchman was put in charge, his wages being paid jointly by plaintiff and intervener until June,

1931, when intervener ceased to contribute. Intervener at this time also was paying for part of the insurance, which later was cancelled by the agent when Webb left.

Intervener did no more work on the premises, and apparently abandoned the whole project in the fall of 1930, when he removed his office supplies, tools and loose equipment after having received a letter from plaintiff's attorney in response to one from himself in which he stated in the closing paragraph: "It being definitely understood and agreed that my thus allowing you the privilege of operating the mill is for the purpose of this test only and is to have no bearing whatever on my rights to the use and operation of this mill and to my ownership of the same." (Aug. 7, 1930.)

Plaintiff's attorney's letter in response was as follows:

"Douglas A. Roller, Attorney at Law,
"824 Equitable Building, Denver,
"August 22, 1930.

"Robert D. Webb, Minden, La.
"Dear Mr. Webb:

"Mr. R. E. L. Townsend has just returned from the mine and found your letter of August 7th awaiting him at his home and has referred the same to me.

"I am very sorry we did not clarify the mill situation while you were here, for, from your letter, you are apparently under a misapprehension as to the facts and status of the mill situation.

"I understand Mr. Brown employed K. F. Fulton as Mill superintendent early in July, at which time Mr. Brown intended to operate the mill on your account; that Mr. Fulton resigned his position to accept employment with Mr. Brown; that after about three weeks time you decided you did not care to operate the mill, thereupon Mr. Townsend for the Empire Chief Mining Company, arranged to take over the operation of the mill and employed Fulton on the company account.

"Fulton started active work putting the mill in shape

on July 21st but was unable to start running the ore until August 6th because of the condition of the mill.

"On July 26th Mr. Brown, Douglas Bowden, H. L. Townsend and Fulton took an itemized inventory of the material on hand, copy of which inventory was given us by Mr. Bowden, and instructions were given to Superintendent Fulton by Brown and H. L. Townsend to treat the ore from the Highland Chief claim on your account and that when he had finished, he was to treat the ore of the company, and Mr. Brown agreed to pay any expenses incurred in the treatment of your ore.

"Fulton was employed by the Empire Chief Company from July 21st to August 5th in preparing the mill for operation, and on August 6th started to run the Highland Chief ore. This run has been completed and a statement will be sent you in a few days. On August 19th Fulton started to run the ore of the Empire Chief Company and is now milling the same.

"Possession of the mill was taken by the Empire Chief Mining Company on July 21st in accordance with their contract with you under date of August 7, 1928, and we are, of course, operating under the terms of the contract.

"We very much appreciate your letter of August 7th and your cooperation in assisting us in making this test of the ore from No. 4 tunnel, and, of course, the company assumes all responsibility for the operations of the mill such as accidents, breakage, wear and tear, fire, (as covered by the insurance), etc. The company will, of course, deposit in a fund, 10% of the milling cost to take care of depreciation charge, as provided in our contract.

"We will keep you fully posted as to the operations of the mill, the grade and kind of ore mined and milled, and will furnish you regular reports.

"*We, however, want to make it clear that we are operating the mill under our contract with you and not under your letter of August 7th,* and we again wish to assure you we appreciate your cooperation with us and we hope

that the operation of the mill will be of benefit to both the company and to yourself.

"Yours sincerely,

"Douglas A. Roller,

"Attorney for Empire Chief Mining Company."

(Italics are mine.)

While the above is only a part of the correspondence between the parties, it is sufficient to indicate the position of each.

Nothing further was said or done about the ownership of the mill thereafter until April, 1935, when intervener again asserted ownership, while negotiating the sale of the mill to the Monitor company, which negotiations immediately preceded this litigation.

Meanwhile, however, at a special meeting of the board of directors of plaintiff company, the following action was taken on September 1, 1931: "Now, therefore, be it resolved that the Empire Chief Mining Company waive the performance of 1000 shifts during the period from May 1, 1931, to May 1, 1932, on the part of Robert D. Webb as required in * * * said agreement."

Intervener, failing to renew operations in 1932, was, after action taken by plaintiff corporation, notified of the cancellation of his lease on July 10, 1933, and on December 6, 1934, he filed a release and waiver with the plaintiff, the last paragraph of which reads as follows:

"And that the said Robert D. Webb not desiring to carry on further development work on said leased properties, according to the terms and conditions set forth in said lease contract, hereby releases unto the said Empire Chief Mining Company the above described mining claims, relinquishing all claim he has unto same, leaving the title to said mining claims clear in the Empire Chief Mining Company in so far as he is concerned.

"This December 6, 1934.

"Robt. D. Webb."

As to the alleged oral contract of September 20, 1928, intervener says it resulted from a conference in his room

at the Albany Hotel in Denver, at which he, R. E. L. Townsend and Brown were present and intervener said: "If I was now going to the expense of putting in a mill of the flotation type, a new style mill, that I wanted it understood that that mill was mine, and I would have the right to remove it if the thing fell down and I didn't find the ore as I expected."

In his testimony, R. E. L. Townsend flatly denied that any such statement was ever made, and in this he is supported by his son, who testified he was present.

█ Brown, intervener's manager and engineer, the only other man alleged to have been present, had died, but before he died he had written intervener a letter which is in part as follows: "In answer to yours of May 19th I remember distinctly our conversation with Mr. Townsend, Harry Townsend and Mr. Roller in which they admitted the machinery installed in the mill was not their property and that it belonged to you." The trial court properly excluded this letter as incompetent.

The only other testimony urged to sustain the alleged oral agreement as to the ownership of the mill was a conversation alleged to have taken place between Booth, secretary of the defendant Monitor company, and the Townsends in a hotel in Texas. In commenting on this testimony, the trial court observed: "Booth claimed to be the Secretary-Treasurer of the defendant, The Monitor Gold Mining Company. His testimony was not only improbable, but I saw and heard him. He was not convincing."

█ It is to be noted that counsel for intervener do not contend that the mill is not included in the broad and inclusive language of paragraphs ninth and seventeenth above quoted, which we italicized, so there was no burden resting on the plaintiff to further establish that it was specifically included. On this point, intervener relied on the alleged oral agreement, concerning which the testimony was clearly conflicting, and there being sufficient

competent evidence to sustain the trial court's ruling in that behalf, we shall not disturb it.

In addition to relying on the alleged oral agreement, intervener, in seeking a reversal of the judgment, relies also on the theory that the mill was a trade fixture, and cites the case of *Rare Metals M. & M. Co. v. Western Colorado Power Co.,* 73 Colo. 30, 213 Pac. 124, in which the lessee was awarded the mill there in question, but in that case, as in the one before us, the court's decision was based on a controlling clause in the lease in which the reservation to the lessor was that he was, in the event of cancellation, to "have the option to purchase the mill or mills of the manufacturer [lessee] at an agreed upon or appraised price." As the court therein says, at page 39, this clause "shows that it was the intention, not only of the lessee, but of the lessor also, that the reduction plant, when erected, was to be a trade fixture and to be the property of the lessee."

And for the same reasons, namely, the controlling clause in the lease and the ruling of the trial court on conflicting evidence, we must distinguish the recent case of *Seaton-Hayden Co. v. Renshaw,* 101 Colo. 342, 73 P. (2d) 999.

It is not to be supposed that the case law pertaining to trade fixtures, as between landlord and tenant, is so substantial as to prevail over positive provisions of a lease regarding said fixtures.

The intervener cannot contend here that he was lulled into a sense of security in believing that he was the owner of the mill. He was present at the stockholders' meeting on August 7, 1928, when his lease was formally approved by the corporation, and made no contention of ownership of the mill for which he was negotiating. He knew he was dealing with a corporation the actions of which to be legal had to be carried on in a certain way. With property valued at $92,000 at stake, it is no defense that he did not, as he says, want to embarrass Townsend, the president of the company, and he admitted that he did

not talk to any of the directors about his alleged oral agreement with Townsend. Finally in December, 1934, when he gave a written release of the premises he made no reservation of the mill. With all this appearing against his contentions, the trial court rightly held that he failed to establish any estoppel or ratification against the plaintiff company, which relied on the provisions of the lease throughout.

It is to be noted, too, that the result here does not place the plaintiff in the position of being unjustly enriched. While intervener had permission to remove the old mill, it would seem he was not justified in just leaving it on the mountainside exposed to the elements which rendered it worthless, as is, no doubt, its present condition. Its value alleged to be $100,000 at the time intervener removed it, is not disputed. To us, it would seem that he wagered the cost of the new mill on the hoped for increased efficiency of the flotation process as applied to the complex ores in that region, and lost. The "boom" he expected did not materialize.

We have carefully read the 2300 folios of evidence contained in the record, and find no prejudicial error in any of the rulings or findings of the trial court necessitating a reversal.

The judgment is affirmed.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE HILLIARD and MR. JUSTICE HOLLAND concur.